Filed 7/31/23  P. v. Etherton CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C093209 |
| Plaintiff and Respondent, | (Super. Ct. No. LOD-CR-FECOD-2017-0000572) |
| v. | |
| KEVIN ETHERTON, | |
| Defendant and Appellant. | |

A jury convicted defendant Kevin Etherton of murdering two people and committing related arson, robbery and burglary offenses.  Sentenced to two consecutive terms of life without the possibility of parole for the murders, plus determinate sentences for the other crimes, he appeals.

Defendant contends (1) the trial court should not have admitted (A) portions of a pathologist's testimony, (B) evidence not disclosed to the defense until trial, and (C) evidence of defendant's character; (2) the trial court erred in applying CALCRIM No. 376 [possession of recently stolen property as evidence of a crime] to one of the murder counts; (3) the prosecutor committed prejudicial misconduct during closing

1

argument; (4) cumulative prejudice requires reversal; (5) one of the two multiple-murder special-circumstance findings must be stricken; and (6) defendant is entitled to remand for a youthful offender hearing.

Finding merit only in the contention that one of the multiple-murder special-circumstance findings must be stricken, we will modify the judgment to strike one of the multiple-murder special-circumstance findings and affirm the judgment as modified.

BACKGROUND

Defendant was tried with codefendant Kenneth Vanderford. Each had his own jury.

*Wiederrich Murder*

Dorothy Wiederrich was 74 years old in 2016. She lived alone. She had previously employed Katrina Johnson, Vanderford's wife, to keep her company, run errands, and do household chores. Johnson had a code to enter Wiederrich's front door. Johnson needed a vehicle, so Wiederrich loaned Johnson money for Johnson and Vanderford to buy a red Ford F150 pickup. After at least three years of working for Wiederrich, Johnson stopped showing up to work regularly, so Wiederrich terminated her employment. A week or two before Wiederrich's death, Johnson called Wiederrich and asked for her job back.

On the morning of February 12, 2016, Wiederrich's son found Wiederrich dead on the kitchen floor. There was a large pool of blood and a long serrated knife on the floor. A handkerchief in Wiederrich's mouth was tied around the back of her head, and her hands were bound behind her back with zip ties. There were no signs of forced entry into the home. Wiederrich's purse was dumped upside down in the kitchen sink, and her wallet was on the counter. Trace amounts of Wiederrich's blood were found throughout the house, including on light switches. In the master bedroom, another purse and a jewelry box were open, and the jewelry box was upside down and empty. Drawers were pulled out.

2

Dr. Robert Lawrence performed an autopsy on Wiederrich's body. She had 10 stab wounds to the left chest area, nine of which were lethal or potentially lethal, aimed at vital organs. Three of the wounds went through the heart. Others impacted the lungs and aorta. Some of the wounds were inflicted so forcefully that the killer's knuckles left bruises on Wiederrich's body. Wiederrich likely died within 30 seconds to one minute after the chest wounds were inflicted. The knife found in the kitchen may have been the murder weapon, but there may have also been other knives involved because not all the wounds exhibited serrations. Wiederrich had defensive knife wounds on her left hand, two of which went all the way through her hand, inflicted before she was zip-tied. There were bruises on Wiederrich's forearms, indicating she had been held tightly by her arms. But there were no scratches associated with the zip ties with which she was bound behind her back, so nothing would indicate a struggle when she was zip-tied.

On a trip to San Francisco with Johnson before her murder, Wiederrich had bought a diamond ring, which she wore on her finger all the time. The ring was missing after Wiederrich's murder. About 10 days after the murder, defendant sold the diamond ring to a pawnshop in Oakland. Defendant entered the pawnshop by himself, but Vanderford's cell phone was also in the area of the pawnshop at the time.

*Gregor Murder*

Defendant was employed selling Kirby vacuum cleaners. He was unhappy with his Kirby employer and believed the employer was using Kirby as a coverup for money laundering and drugs. Defendant tried to recruit a Kirby coworker to commit crimes to get guns and drugs. Defendant showed the coworker his hunting gear, including a collection of knives, and tried to recruit the coworker to participate in a robbery of the employer.

On September 25, 2016, seven months after the murder of Wiederrich, law enforcement and the fire department were called to the scene of a house fire. Inside, they

3

found the body of Alan Gregor, who had suffered stab and burn wounds. The fire was caused by the application and lighting of a petroleum distillate on a sofa next to where Gregor's body was found. Four days before Gregor's death, defendant had been at Gregor's home trying to sell him a Kirby vacuum, but defendant did not make a sale because Gregor was too intoxicated and did not have good credit.

Dr. Bennet Omalu performed an autopsy on Gregor's body. All of the surfaces of Gregor's body were consumed by the fire. There were three stab wounds on the neck, four on the left chest in the area of the heart, and one on the right side of the chest. There was also a stab wound behind the neck that extended into the chest. Because there were no defensive wounds, Gregor had probably been immobilized when he received the stab wounds. It was therefore more likely than not there were two perpetrators. The extent of the wounds indicated "overkill," which Dr. Omalu defined as "mutilating, destructive wounds, which are unnecessary to killing the person . . . " or "a phenomenon in which the multiplicity of wounds far outnumbers that required to cause death." The term is defined in a 1996 paper in the American Journal of Forensic Medicine and Pathology. It may indicate rage and that the attacker knew the victim.

A neighbor's security video footage showed a red Ford pickup repeatedly passing by around the time of Gregor's murder. It appeared two people were in the truck. Wiederrich's granddaughter identified the truck in the security video as belonging to Johnson and Vanderford. When law enforcement questioned defendant, he said he was friends with Vanderford and had ridden in Vanderford's truck. He also admitted he had gone to Gregor's house with Vanderford on the day of the murder, but he claimed they stayed for only a few minutes and Gregor was alive when they left. He also claimed Gregor said something about unlocking $150,000 from his grandfather's pension. Vanderford "perked up" when he heard this and became aggressive with Gregor. Defendant said he left the house, but that Vanderford stayed behind for a few minutes and came out through the side door of the house with a bag and with blood on his pants and

4

shirt and favoring his right arm. Defendant said he was too scared to ask Vanderford what happened. Defendant claimed he did not know how the fire started.

*Jailhouse Informants*

Four jailhouse informants testified for the prosecution.

Defendant told fellow inmate Ronnie Brown about both murders. Defendant told Brown he pawned a ring connected with a murder Vanderford committed. He asked Brown to go get the ring because it would tie defendant to the murder. Defendant also asked Brown to report to authorities that Brown heard what defendant told him from Vanderford. About the Gregor murder, defendant told Brown both defendant and Vanderford went into the house. Both defendant and Vanderford had tasers. Gregor decided not to buy a vacuum, and Vanderford got upset. Gregor and Vanderford argued, and Gregor told Vanderford to leave the house. Vanderford used his taser on Gregor. Defendant left the house and smoked a cigarette. Fifteen minutes later, Vanderford came out of the house carrying a bag that contained marijuana, some wires, and a shirt. Defendant told Brown that Gregor was stabbed three times, once in the neck, and that a fire was set to cover up the evidence.

Defendant told fellow inmate Roy Rhoades that defendant participated with another person in tying up and stabbing to death an older female in Lodi. He also told Rhoades they had set her on fire. Defendant told Rhoades he met a man while selling Kirby vacuums. The man was supposed to get some money from a settlement but did not. Defendant killed the man because the man was drunk and defendant did not like him.

Defendant was incarcerated with Timothy August. August was previously incarcerated with Vanderford and overhead Vanderford talking about some murders. He also heard Vanderford talking about taking a ring from a woman named Dorothy who used to help Vanderford and his wife, and selling the ring in Oakland. Vanderford talked about a murder committed after they went to a house to sell someone a Kirby vacuum,

5

and that Vanderford lit a couch or the body on fire. Defendant later had August write a letter to law enforcement on defendant's behalf.

James Fincher was Vanderford's cellmate. Fincher sent a letter to the prosecutor recounting that Vanderford had told him he and defendant plotted to rob Gregor because defendant had heard Gregor was getting some money. Defendant was going to go into the house first like he was going to sell Gregor a vacuum, and Vanderford was to follow defendant into the house. When defendant and Vanderford entered, Gregor wanted to know who Vanderford was. Defendant and Vanderford attacked Gregor. Defendant held Gregor down while Vanderford stabbed Gregor "close to nine" times.

*Vanderford Testimony*

Vanderford testified and claimed he was not involved in the Wiederrich murder and did not have the code for her door. He acknowledged going to Oakland when defendant pawned the ring but claimed he did not know defendant was selling Wiederrich's ring. Concerning the Gregor murder, Vanderford testified he drove defendant to Gregor's house but stayed outside in his truck.

*Conviction and Sentencing*

Defendant's jury convicted him of the following: first degree murder of Gregor (Pen. Code, § 187 -- count 1),[1] with findings the murder was committed during the course of burglary and robbery (§§ 211, 460); first degree burglary of Gregor (§ 459 -- count 2); second degree robbery of Gregor (§ 211 -- count 3); arson of an inhabited structure (§ 451, subd. (b) -- count 4); first degree murder of Wiederrich (§ 187 -- count 5), with findings the murder was committed during the course of burglary and robbery (§§ 211, 460); first degree burglary of Wiederrich (§ 459 -- count 6); and first

---

[1] Undesignated statutory references are to the Penal Code.

6

degree residential robbery of Wiederrich (§ 211 -- count 7). The jury also found, as to each murder count, that defendant committed multiple murders. (§ 190.2, subd. (a)(3).)

The trial court sentenced defendant to consecutive sentences of life without the possibility of parole on the two murder counts. The trial court imposed a consecutive upper term of eight years for arson of an inhabited structure. And the trial court imposed upper term sentences for the burglaries and robberies but stayed those sentences under section 654.

DISCUSSION

I

Defendant contends the trial court should not have admitted (A) portions of Dr. Omalu's testimony, (B) evidence not disclosed to the defense until trial, and (C) evidence of defendant's character. We address each argument in turn.

A

Before trial, defendant filed a motion to exclude some of the testimony of Dr. Omalu, the pathologist who performed the Gregor autopsy. Defendant claimed Dr. Omalu had a habit of offering inappropriate opinions that tended to unfairly prejudice the defendant and confuse the jury. The trial court said it would limit Dr. Omalu's testimony on some topics but otherwise allow Dr. Omalu to testify for the prosecution.

Defendant now argues (1) Dr. Omalu testified on excluded topics, (2) some of Dr. Omalu's testimony was speculative and/or inappropriate, (3) Dr. Omalu testified beyond his expertise, (4) some of Dr. Omalu's testimony should have been excluded under Evidence Code section 352, and (5) the evidentiary error was not harmless and defendant's trial counsel was ineffective to the extent counsel failed to preserve the issues for appeal.

1. *Asserted Violations of the Trial Court's Pretrial Rulings*

The trial court granted defendant's pretrial motion to exclude portions of Dr. Omalu's testimony. Defendant contends that some of the excluded evidence

7

was admitted in violation of the trial court's earlier rulings. Defendant notes that it was the prosecutor's responsibility to make sure Dr. Omalu's testimony complied with the earlier rulings. (See, e.g., *People v. Warren* (1988) 45 Cal.3d 471, 481 ["A prosecutor has the duty to guard against statements by his witnesses containing inadmissible evidence."].) But defendant does not assert prosecutorial misconduct, possibly because defendant did not preserve the issue by objecting and asking for a jury admonition. (See *People v. Thornton* (2007) 41 Cal.4th 391, 454 [defendant must preserve the issue of prosecutorial misconduct by making a timely objection and requesting a jury admonition].) Instead, defendant contends the trial court should have ensured compliance with its prior rulings.

Defendant does not provide authority for the proposition that a trial court has an independent duty to ensure compliance with its in limine rulings, and we are not aware of any. However, there is authority that making a pretrial in limine objection to evidence preserves for appeal whether the evidence was properly admitted, even if defendant did not object at the time the evidence was introduced. (*People v. Memory* (2010) 182 Cal.App.4th 835, 857.) Accordingly, the question we consider here is limited to whether the challenged portions of Dr. Omalu's testimony should have been allowed.

Defendant argues Dr. Omalu's testimony violated the trial court's evidentiary rulings in four ways. First, Dr. Omalu testified concerning the intent of the perpetrator. For example, he testified that the cluster of wounds around the heart showed an intent to damage the heart and cause death, the perpetrator intended to conceal or destroy Gregor's body by setting it on fire, and the perpetrator intended to mutilate or obliterate the anatomy of Gregor's body. Second, Dr. Omalu testified, based on the wounds and other evidence from the scene, that the victims knew the perpetrator. Third, Dr. Omalu testified, based on wounds, that Gregor did not fight back. And fourth, Dr. Omalu

8

testified that videos found on Vanderford's cell phone depicted Satanic, ritualistic killings.**2**

Although such testimony may appear problematic, defendant makes no specific argument and presents no authority that such testimony was inadmissible. (See Cal. Rules of Court, rule 8.204(a)(1)(B) [appellate briefs must state each point under a separate heading or subheading and support the point with argument and, if possible, authority]; *Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.) Instead, he contends the trial court should have prevented testimony that was inconsistent with prior rulings. But such an argument does not establish reversible error on appeal. It was incumbent on defendant to establish on appeal that the challenged evidence was inadmissible and prejudicially admitted by making a reasoned contention and citing authority to support the contention. (*People v. Harvey* (1991) 233 Cal.App.3d 1206, 1227-1228 [appellant bears burden of establishing error and prejudice, with relevant citations to authority].) We need not independently identify authority for defendant's arguments. (Cal. Rules of Court, rule 8.204(a)(1)(B).) Defendant has not met his burden on appeal.

2. *Testimony Asserted to Have Been Speculative and/or Inappropriate*

Defendant contends some of Dr. Omalu's testimony was speculative and/or inappropriate.

"California law permits a person with 'special knowledge, skill, experience, training, or education' in a particular field to qualify as an expert witness (Evid. Code, § 720), and to give testimony in the form of an opinion (Evid. Code, § 801). A trial court generally has 'broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for

---

**2** During the trial, defendant objected to the statement that the killings were ritualistic and Satanic. The trial court sustained the objection and struck the testimony.

admissibility is subject to review for abuse of discretion.' (*People v. McDowell* (2012) 54 Cal.4th 395, 426.) [¶] Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of that testimony is 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' (Evid. Code, § 801, subd. (a).)" (*People v. Ewing* (2016) 244 Cal.App.4th 359, 381-382.) A trial court's determination as to whether an expert should be allowed to opine about a particular subject is reviewed on appeal for abuse of discretion. (*People v. Catlin* (2001) 26 Cal.4th 81, 131.)

Dr. Omalu testified that the way Gregor was killed constituted "overkill," which he said was a forensic term referring to a situation in which "the multiplicity of wounds far outnumbers that required to cause death." Dr. Omalu said such circumstances involved rage and often an intimate bond between the victim and the perpetrator. He cited a paper on overkill in a forensic medicine and pathology journal. Dr. Omalu added: "If you want to kill somebody, you stab a person once, you kill the person. But then when you start in addition to causing mutilation, destructive wounds, which are unnecessary to kill the person, that is the definition of overkill." Dr. Omalu said robbers "may stab once and run. They don't go stab the body multiple times, tie the body around the back, and set the house on fire."

Defendant argues this testimony concerning overkill was inadmissible speculation. According to defendant, "[Dr.] Omalu did not provide any logical or empirical basis explaining how the facts of these murders pointed to 'overkill' rather than merely the intent to kill." We disagree. Dr. Omalu referenced medical authority to opine that the murders involved overkill. The testimony explained that overkill is different from other modes of killing.

Defendant further argues that Dr. Omalu's reference to mutilation improperly addressed the perpetrator's intent. But in this portion of the testimony Dr. Omalu simply

10

referenced wounds that were not necessary to cause death. It remained for the jury to consider the perpetrator's intent. The testimony did not invade the province of the jury.

Dr. Omalu testified that, based on the scene of the crime and the condition of the body, the perpetrator stayed at the scene after the killing. Dr. Omalu characterized the wounds as "appearing ritualistic." In response to cross-examination by counsel for Vanderford and the prosecutor concerning both murders, Dr. Omalu opined that the perpetrator was there while the victims reacted to their injuries and eventually died. He based his opinion on studies of the "modalities of homicides."

Defendant contends this testimony was also inadmissibly speculative because there was no evidence the perpetrator saw the victims die or spent time with the bodies or that the killings were ritualistic. He further maintains both killings were "entirely consistent with a home invasion committed for the purpose of stealing property." While defendant could assert this alternative interpretation of the evidence, he does not establish that Dr. Omalu's interpretation of the evidence was speculative. Dr. Omalu's interpretation was based on studies and, in his words, "epidemiological facts."

Dr. Omalu described the process of death from stab wounds, including the noises the victim would make and the pain the victim would feel. Defendant argues the testimony about this process, including the noises and pain, was irrelevant. However, this testimony was relevant to how the murder was committed and whether the victim was able to resist after the wounds were inflicted.

3. *Evidence Assertedly Beyond Pathologist's Expertise*

Defendant argues the testimony challenged in the previous contention was also beyond Dr. Omalu's expertise. Defendant claims that although Dr. Omalu described training in forensic pathology and forensic epidemiology, nothing in either area of expertise qualified Dr. Omalu to opine about the amount of pain experienced by a living person during a stabbing, the sounds or involuntary physical responses of a living person while being stabbed, a person's motivation for inflicting a single stab wound versus

11

multiple stab wounds, or the circumstances that distinguish a robbery-murder from a ritualistic killing.

Dr. Omalu was board-certified in anatomic pathology, clinical pathology, forensic pathology, and neuropathology. He said that when doing autopsies and determining the manner and mechanism of death, he uses all of his education and specialties. Dr. Omalu was trained on and could give his opinion on the various conditions surrounding the suffering and death of the victims. He was also informed on motivations and circumstances of crimes resulting in a specific manner of death. He referenced studies on how murders are committed, which was relevant to whether the murders were part of robberies gone wrong or were premeditated. For example, he testified regarding studies about the concept of overkill and his experience in such cases. The trial court did not abuse its discretion in admitting the challenged testimony based on Dr. Omalu's expertise.

4. *Evidence Code section 352*

As to the same testimony from Dr. Omalu, defendant contends the trial court should have excluded the evidence under Evidence Code section 352.

Relevant evidence may be excluded because its probative value is substantially outweighed by the possibility of prejudice. (Evid. Code, § 352.) We review the trial court's Evidence Code section 352 rulings for abuse of discretion. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)

Defendant argues the evidence was inflammatory and lacking in probative value. But we have already identified the probative value of the evidence. Moreover, the testimony was not unduly prejudicial. Relevant evidence reflecting the gruesome nature of an offense is not the type of prejudicial evidence that must be excluded under Evidence Code section 352. (*People v. Zapien* (1993) 4 Cal.4th 929, 958.)

5. *Harmless Error and Ineffective Assistance of Counsel*

Defendant contends the asserted errors in admitting Dr. Omalu's testimony were not harmless and, if trial counsel failed to preserve these issues for appeal, she provided ineffective assistance of counsel. Because we have considered defendant's contentions regarding Dr. Omalu's testimony and have found them to be without merit, defendant has not established reversible prejudice.

B

In addition, defendant contends the trial court abused its discretion and violated his statutory and due process rights by admitting evidence newly discovered by the prosecution during trial.

Long before trial, investigators seized cell phones from defendant and Vanderford, and in the years before trial numerous unsuccessful efforts were made to access the contents of the cell phones. During trial, the high-tech crime force purchased a new machine that was able to access the contents of the phones. As soon as the prosecution received the downloads of the phones' contents, those downloads were provided to the defense as discovery.

Two weeks after the prosecution provided discovery to defendant on the contents of the phones, the prosecution sought to introduce some of the contents in its case-in-chief. As relevant to this discussion, the trial court admitted some of the phones' contents, overruling objections concerning the late discovery. According to defendant, the late-discovered evidence included a photo on Vanderford's phone of a pipe threader, a text message from defendant to Vanderford with the address of an elderly man who had a gun safe, and defendant's internet searches for zip ties and handcuffs. The trial court excluded videos from Vanderford's phone showing people having their throats cut. While the trial court excluded the actual videos, it allowed verbal descriptions of the videos. We need not discuss other contents of the phones because they were excluded by the trial court after an Evidence Code section 352 analysis.

13

"Section 1054.1 provides, in pertinent part, that the 'prosecuting attorney shall disclose' certain types of material to defense counsel if the evidence 'is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies.' Such disclosure 'shall be made at least 30 days prior to the trial' or as soon as the prosecution learns of the documents or information. (§ 1054.7.)[3] To prevail on a claim alleging a violation of discovery statutes, an appellant must show there is a reasonable probability that, had the evidence been disclosed, the result of the proceedings would have been different. [Citation.]" (*People v. Mora & Rangel* (2018) 5 Cal.5th 442, 467.) We review a trial court's discovery rulings for abuse of discretion. (*People v. Ayala* (2000) 23 Cal.4th 225, 299.)

Defendant claims the trial court abused its discretion under section 1054.7 because the prosecution possessed the evidence long before trial and did not disclose it at least 30 days before trial. Our understanding of the record, however, is that although the prosecution possessed the phones long before trial, the downloaded contents of the phones did not become available to the prosecution until trial. The duty to disclose the evidence arises only when "the material and information becomes known to" the prosecution. (§ 1054.7.) Defendant provides no authority for the proposition that possessing the phones required the prosecution to disclose what was on the phones 30 days before trial when the prosecution did not have the means to access the contents

---

[3] Section 1054.7 provides, in part: "The disclosures required under this chapter shall be made at least 30 days prior to the trial, unless good cause is shown why a disclosure should be denied, restricted, or deferred. If the material and information becomes known to, or comes into the possession of, a party within 30 days of trial, disclosure shall be made immediately, unless good cause is shown why a disclosure should be denied, restricted, or deferred. 'Good cause' is limited to threats or possible danger to the safety of a victim or witness, possible loss or destruction of evidence, or possible compromise of other investigations by law enforcement."

of the phones until later. Here, the 30-day requirement did not apply to the content of the phones.

Defendant nevertheless claims there was no good cause to admit the late-discovered evidence. But the good-cause requirement is not dispositive here because the prosecution disclosed the content of the phones soon after it became available. The prosecution did not violate section 1054.7.

In addition to his statutory argument, defendant contends admission of the newly discovered evidence violated his constitutional due process rights. Defendant's due process rights include a reasonable opportunity for counsel to prepare for trial. (*People v. Murphy* (1963) 59 Cal.2d 818, 825.) Defendant asserts counsel did not have a reasonable opportunity to prepare his defense because of the admission of the newly discovered evidence. In support, he argues the defense strategy may have been different if the evidence had been excluded. However, such speculation is insufficient to establish a prejudicial due process violation. (*People v. Lewis* (2015) 234 Cal.App.4th 203, 213.)

Admission of the late-discovered evidence from the cell phones did not violate defendant's statutory or constitutional rights.

Finally, as to the newly discovered evidence, defendant contends trial counsel provided ineffective assistance because she failed to seek a late-discovery instruction. But defendant does not cite authority relating to a late-discovery instruction and fails to explain how such an instruction would have produced a different result. (*People v. Stanley* (1995) 10 Cal.4th 764, 793 [bare assertion of error without authority or argument forfeits issue on appeal].)

C

Defendant next contends the trial court abused its discretion by admitting evidence of defendant's prior bad acts as evidence of his character. He asserts the trial court erred by admitting text messages between defendant and Vanderford pertaining to thefts from

15

Wal-Mart and by allowing the prosecution and Vanderford's counsel to cross-examine defendant's character witness concerning defendant's prior bad acts.

*Text Messages Pertaining to Thefts from Wal-Mart*

Before trial, the trial court ruled that evidence of Vanderford's statement about how he and defendant stole from Wal-Mart would be excluded under Evidence Code section 352. During trial, the trial court acknowledged its prior ruling but said the text messages could show a link between defendant and Vanderford and ruled that it would allow text messages that did not indicate defendant and Vanderford were involved in thefts from Wal-Mart. Thereafter, the prosecution introduced evidence of text messages that arguably suggested defendant and Vanderford were working in concert to steal items from Wal-Mart. For example, they discussed "doing Wal-Mart." Vanderford warned defendant to "bail" and that "they're on you." Other text messages also implied theft from Wal-Mart.

Defendant once again argues the trial court should have ensured that the evidence did not violate its rulings. But again, defendant provides no authority for the proposition that the trial court had such an independent duty. Because defendant does not argue the texts were inadmissible for a reason other than that they violated a prior order, his contention lacks merit.

*Admission of Cross-examination Testimony*

Defendant called family members as character witnesses to testify defendant was not violent or abusive. Defendant contends the trial court abused its discretion by admitting the testimony of defendant's wife during cross-examination from the prosecutor and Vanderford's counsel. We conclude defendant forfeited his challenge to the cross-examination evidence.

The cross-examination testimony he claims on appeal was inadmissible includes the following:

16

- The prosecution introduced an exhibit showing searches from defendant's internet account on the topic of making methamphetamine. The prosecutor and counsel for Vanderford asked defendant's wife whether she searched the internet for making methamphetamine, either with defendant or by herself. She said she did not.
- The prosecutor asked defendant's wife whether defendant had asked Ryan Clubb about ".45 ammunition or .22 long rifle." Defendant's wife responded that the ammunition was for an AR-15 defendant had given to her.
- The prosecutor asked whether defendant had been fired from a job with Diamond Foods. She answered in the affirmative.

Defendant contends this testimony was inadmissible character evidence under Evidence Code section 1101. He also contends the bad acts went beyond the scope of the character evidence provided by the defense witnesses. But defendant did not object to any of this testimony on the grounds now asserted. He therefore forfeited consideration of the admission of the evidence. (*People v. Maury* (2003) 30 Cal.4th 342, 387-388 [failure to object to evidence based on the ground asserted on appeal forfeits the contention].)

*Claims of Ineffective Assistance*

As to both the evidence implying thefts from Wal-Mart and the bad character evidence, defendant contends trial counsel provided ineffective assistance of counsel because she did not object to the evidence on the grounds now asserted. "In order to establish a claim for ineffective assistance of counsel, a defendant must show that his or her counsel's performance was deficient, and that the defendant suffered prejudice as a result of such deficient performance." (*People v. Mickel* (2016) 2 Cal.5th 181, 198 (*Mickel*), citing *Strickland v. Washington* (1984) 466 U.S. 668, 687-692 [80 L.Ed.2d 674] (*Strickland*).)

17

As for the evidence of thefts from Wal-Mart, the only contention on appeal is that the trial court failed to recognize that admission of certain evidence violated the trial court's earlier evidentiary rulings. We rejected the contention on the merits. Accordingly, defendant has not established that trial counsel was deficient.

As for the character evidence, defendant fails to establish undue prejudice. Questioning of the defense witness about defendant's bad character was proper after defense proffered evidence of good character. (Evid. Code, § 1102.) And the testimony of defendant's wife regarding drugs and guns was not unduly prejudicial in light of other evidence. For example, defendant elicited evidence from a prosecution witness on cross-examination that defendant "was plotting or discussing plans about drugs and guns." And defendant's wife admitted defendant possessed an AR-15, which contradicted earlier testimony that defendant did not possess guns. (*Strickland, supra*, 466 U.S. at p. 697 [no need to consider deficient representation if there is no prejudice].) Defendant's ineffective assistance claim is without merit.

II

Defendant further contends the trial court erred in instructing the jury with CALCRIM No. 376 [possession of recently stolen property as evidence of a crime] in connection with the count charging the murder of Wiederrich.

Over defendant's general objection, the trial court instructed the jury using CALCRIM No. 376, as follows:

"If you conclude that a defendant knew he possessed property and you conclude that the property had in fact been recently stolen, you may not convict the defendant based on those facts alone. However, if you also find that supporting evidence tends to prove his guilt, then you may conclude that the evidence is sufficient to prove he committed Counts 5 through 7 [murder, burglary, and robbery of Wiederrich].

18

"The supporting evidence need only be slight and need not be enough by itself to prove guilt. You may consider how, where, and when the defendant possessed the property, along with any other relevant circumstances tending to prove his guilt.

"Remember that you may not convict the defendant of any crime unless you are convinced that each fact essential to that conclusion that the defendant is guilty of that crime has been proved beyond a reasonable doubt."

The California Supreme Court stated that CALJIC No. 2.15, which is substantially similar to CALCRIM No. 376, "is based on the long-standing rule allowing a jury to infer guilt of a *theft-related crime* from the fact that a defendant is found in possession of recently stolen property when such evidence is accompanied by slight corroboration of other inculpatory circumstances tending to show guilt. [Citation.] It is a permissive, cautionary instruction 'generally favorable to defendants; its purpose is to emphasize that possession of stolen property, alone, is insufficient to sustain a conviction for a theft-related crime.' " (*People v. Rogers* (2013) 57 Cal.4th 296, 335, italics added.) On the other hand, the California Supreme Court " 'cautioned that the instruction is inappropriate for *non-theft-related crimes*, and instructing that possession of stolen property may create an inference that a defendant is guilty of murder . . . is error.' " (*Rogers,* at p. 335, italics added; see also *People v. Barker* (2001) 91 Cal.App.4th 1166, 1176 (*Barker*) [proof a defendant was in possession of recently stolen property does not lead naturally and logically to a conclusion that he committed a murder to obtain the property].)

Here, the trial court erred by instructing the jury using CALCRIM No. 376 as to the Wiederrich murder, even though the instruction was proper as to the Wiederrich burglary and robbery. The People do not argue otherwise. The murder charge was accompanied by burglary and robbery special circumstance allegations, but the jury instruction related to the murder charge, not the special circumstance allegations. (See

19

*People v. Harden* (2003) 110 Cal.App.4th 848, 856 (*Harden*) [instruction proper with respect to theft-related special circumstance allegations].)

Nevertheless, we conclude the error was harmless under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818. There is no reasonable likelihood the jury misinterpreted the law in a way potentially unfavorable to the defense. (*Barker, supra*, 91 Cal.App.4th at p. 1176.)

One of the jailhouse informants testified that defendant said he and Vanderford killed Wiederrich. Defendant told the informant he and Vanderford tied up Wiederrich and stabbed her to death. There was also considerable evidence connecting defendant and Vanderford in their criminal enterprise, including all the evidence and jailhouse witness testimony that tied both defendant and Vanderford to the Gregor murder. Although the CALCRIM No. 376 instruction should not have been given concerning whether the jury could infer defendant's participation in the murder from his pawning of Wiederrich's ring, there is overwhelming evidence that defendant was associated with Vanderford in committing crimes and that the Wiederrich murder was one of the crimes.

Furthermore, the trial court's instructions informed the jury of the elements of murder and of the requirement that each of those elements must be proven by the prosecution beyond a reasonable doubt. Consequently, the potential prejudicial impact of CALCRIM No. 376 was not significant. It is not reasonably probable defendant would have obtained a more favorable verdict had CALCRIM No. 376 been given only as to the crimes of robbery and burglary. (*Harden, supra*, 110 Cal.App.4th at p. 860.)

III

In addition, defendant contends some of the prosecutor's statements during closing argument constituted prejudicial misconduct.

" 'A prosecutor's conduct violates a defendant's [federal] constitutional rights when the behavior comprises a pattern of conduct so egregious that it infects " 'the trial with unfairness as to make the resulting conviction a denial of due process.' [Citation.]"

20

[Citation.]  The focus of the inquiry is on the effect of the prosecutor's action on the defendant, not on the intent or bad faith of the prosecutor.  [Citation.]  Conduct that does not render a trial fundamentally unfair is error under state law only when it involves " ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' [Citation.]  ' "A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.  [Citation.] Also, a claim of prosecutorial misconduct is not preserved for appeal if defendant fails to object and seek an admonition if an objection and jury admonition would have cured the injury." ' [Citation.]" (*People v. Young* (2019) 7 Cal.5th 905, 932-933 (*Young*).)

During the prosecutor's closing argument, he told the jury he wanted "everybody to know . . . we did the right thing and we gave this defendant his rights."  He continued that defendant did not give Wiederrich and Gregor their rights when he killed them. Defendant did not object to this argument.

During the prosecution's rebuttal argument, the prosecutor talked about the two murder victims:  "Sometimes, sometimes we kind of forget what we're here for. Obviously Dorothy and Alan can't be here.  And we kind of treat them like play things. We throw up the pictures of what happened to them.  Just keep throwing them up.  You know, when you murder someone you kind of take their dignity, and you take their purpose, and we just kind of pile on.  I don't know, I couldn't imagine how those victims would feel the way we just throw their pictures around.  But I think for you to really understand murder, it's not so much that you see it, but you kind of just have to be aware of what it's about."

As he was making this argument, the prosecutor picked up the knife used to kill Wiederrich and approached the jury.  Defense counsel objected that the conduct of picking up the knife and approaching the jury would enflame the emotions of the jurors and distract them from deciding the case on the evidence.  The trial court overruled the

objection because the knife was evidence and could be shown to the jury. The settled statement on appeal reflects: "[T]he prosecutor removed the knife from its box, held it in his right hand, then laid the blade in his left palm. The prosecutor did not make any stabbing motions. Dried blood was visible on the knife. The prosecutor was approximately three to five feet from the jury while holding the knife."

Defendant asserts on appeal that the prosecutor committed misconduct by appealing to the jurors' sympathy for the victims. (See *People v. Kipp* (2001) 26 Cal.4th 1100, 1129-1130 [improper for prosecutor to appeal to the jury's sympathy].) But defendant did not object to the prosecution's closing argument, including rebuttal, on the ground that the argument improperly appealed for sympathy, and he did not request a jury admonition about sympathy. The misconduct argument is therefore forfeited. (*Young, supra*, 7 Cal.5th at p. 933.)

In any event, there is no reasonable probability the jury failed to perform its duty to decide the case on the evidence and the law. (*Young, supra*, 7 Cal.5th at p. 933.) Defendant disagrees, asserting that the comments were important parts of the prosecutor's closing argument and that they were likely to sway the jury. But it is unlikely the comments had an undue impact on the result. Having determined there was no prejudice, defendant's further contention that trial counsel provided ineffective assistance also lacks merit. (*Mickel, supra*, 2 Cal.5th at p. 198.)

Defendant also argues the prosecutor's handling of the knife was misconduct. We disagree. That the knife was a weapon and had blood on it are part of the evidence submitted to the jury, and the prosecution properly used the knife in closing argument. The trial court did not abuse its discretion by allowing the prosecution to handle and show the jury the knife during closing argument, as it was part of the evidence.

## IV

Defendant contends generally that, even if errors were not prejudicial individually, the cumulative prejudice resulting from the errors requires reversal. (See *People v.*

*Cardenas* (1982) 31 Cal.3d 897, 907 [cumulative prejudice may require reversal].)
Defendant makes no specific argument about how prejudice may have accumulated to the
extent it requires reversal, and we see nothing in the record and in defendant's
contentions warranting reversal for cumulative prejudice.

V

Defendant contends, and the People agree, that we must strike one of the two
multiple-murder special-circumstance findings. We also agree. Two murders support
only one multiple-murder special circumstance, not one per count. (*People v. Avena*
(1996) 13 Cal.4th 394, 425.) Here, the jury found true a multiple-murder special
circumstance for each murder, counts 1 and 5. We will modify the judgment to strike the
multiple-murder special circumstance as to count 5.

VI

Youthful offenders sentenced to a term of 25 years to life for a controlling offense
are eligible under section 3051, subdivision (b)(3) for early parole consideration, even if
their aggregate term, including terms imposed for other crimes or enhancements, is the
functional equivalent of life without the possibility of parole. (*People v. Hardin* (2022)
84 Cal.App.5th 273, 277-278 (*Hardin*), review granted Jan. 11, 2023, S277487.)
However, section 3051, subdivision (b) does not afford youthful offenders like defendant,
who was 24 years old when he committed the crimes, early parole consideration if they
were sentenced to life without the possibility of parole for a controlling offense.

In supplemental briefing, defendant contends he is nevertheless entitled to remand
for a youthful offender hearing under *People v. Franklin* (2016) 63 Cal.4th 261, 283-284
as a prelude to eventual early parole consideration because the denial of early parole
consideration violates his equal protection rights. The People respond that the statutory
distinction between youthful offenders sentenced to life without the possibility of parole
and those sentenced to lesser life terms does not violate equal protection principles. The
districts of the Court of Appeal are split on this issue, with all except for one division of

23

the Second Appellate District holding that the distinction does not violate equal protection principles. (See *People v. Ngo* (2023) 89 Cal.App.5th 116, 124, review granted May 17, 2023, S279458 (*Ngo*) and cases cited [rejecting equal protection argument]; contra *Hardin, supra*, 84 Cal.App.5th 273, review granted [finding equal protection violation].)

Defendant does not argue that he is a member of a suspect class or that a fundamental right is implicated here; therefore, his equal protection claim is subject to rational basis review. (*Ngo, supra*, 89 Cal.App.5th at p. 122, review granted.) "In order to decide whether a statutory distinction . . . is unconstitutional as a matter of equal protection, we typically ask two questions. We first ask whether the state adopted a classification affecting two or more groups that are similarly situated in an unequal manner. [Citation.] If we deem the groups at issue similarly situated in all material respects, we consider whether the challenged classification ultimately bears a rational relationship to a legitimate state purpose. [Citation.] A classification in a statute is presumed rational until the challenger shows that no rational basis for the unequal treatment is reasonably conceivable. [Citations.] The underlying rationale for a statutory classification need not have been ' "ever actually articulated' " by lawmakers, and it does not need to ' "be empirically substantiated." ' [Citation.] Nor does the logic behind a potential justification need to be persuasive or sensible -- rather than simply rational. [Citation.]" (*People v. Chatman* (2018) 4 Cal.5th 277, 289.)

Even if youthful offenders sentenced to life without the possibility of parole are similarly situated to youthful offenders not sentenced to life without the possibility of parole, we agree with the majority of cases holding that such separate treatment bears a rational relationship to a legitimate state purpose. (*Ngo, supra*, 89 Cal.App.5th at pp. 122-124, review granted.) The court in *Ngo* described several rational bases for treating the two groups differently. For example, the statute (§ 3051) was enacted in response to the California Supreme Court's decision in *People v. Caballero* (2012)

24

55 Cal.4th 262, and the Legislature could rationally limit its response based on the scope of that court decision. (*Ngo,* at p. 123.) In addition, the Legislature has provided for sentences of life without the possibility of parole only for those who commit the most heinous crimes. (*Ibid*.) " ' "It is the prerogative, indeed the duty, of the Legislature to recognize degrees of culpability when drafting a Penal Code." [Citation.]' (*People v. Wilkinson* (2004) 33 Cal.4th 821, 840.)" (*Ngo,* at p. 124.)

The minority view espoused in *Hardin, supra*, 84 Cal.App.5th 273 is that "[t]here is no rational basis for distinguishing between young adult offenders sentenced to life without parole and other young adult offenders for purposes of section 3051." (*Id*. at p. 288, review granted, italics omitted.) While noting the "broad deference properly accorded legislative decisionmaking under rational basis review [citation]" (*ibid.*), the *Hardin* court pointed out that section 3051 was meant to acknowledge that youthful offenders are not fully developed. The court reasoned that deliberately excluding youthful offenders sentenced to life without the possibility of parole from early parole consideration does not rationally advance that legislative purpose. (*Id*. at pp. 288-291.)

We agree with the court in *Ngo* that *Hardin*'s view of the legislative purpose behind section 3051 is unnecessarily narrow and does not give sufficient deference to legislative decisionmaking. (*Ngo, supra*, 89 Cal.App.5th at pp. 124-126, review granted.) Using a special circumstance, with its resulting sentence of life without the possibility of parole, to differentiate between youthful offenders eligible and not eligible for early parole consideration is a rational way to distinguish between degrees of culpability and base punitive consequences on that differentiation. While the purpose to distinguish between degrees of culpability may not have been stated expressly by the Legislature when enacting section 3051, it is certainly implied in the differential treatment between youthful offenders sentenced to life without the possibility of parole and youthful offenders sentenced to other terms, even if those other terms amount to the functional

25

equivalent of life without the possibility of parole. Thus, section 3051's inherent distinction between those two groups is rationally related to a proper legislative purpose.

Defendant's equal protection argument lacks merit.

## DISPOSITION

The judgment is modified to strike the multiple-murder special circumstance on count 5. The judgment is affirmed as modified. The trial court shall prepare an amended abstract of judgment reflecting the judgment as modified and forward a copy of the amended abstract to the Department of Corrections and Rehabilitation.


_____/S/_____
MAURO, J.



We concur:



_____/S/_____
HULL, Acting P. J.



_____/S/_____
ROBIE, J.

26